## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENISE RILEY,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **No. 13-7205** |
| **v.** | : | |
| | : | |
| **ST. MARY MEDICAL CENTER,** | : | |
| **Defendant.** | : | |

**MCHUGH, J.**                                                    **OCTOBER 6, 2015**

## <u>MEMORANDUM OPINION</u>

Plaintiff Denise Riley brings this action against Defendant, St. Mary Medical Center ("St. Mary") for unlawful age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA") and Pennsylvania Human Relations Act ("PHRA"). Plaintiff's employment as a nurse at St. Mary was terminated in January 2013. Riley claims that St. Mary's various reasons for her termination—including unsatisfactory job performance, numerous patient complaints, and lack of improvement—all serve as pretext for age-based discrimination. St. Mary has moved for Summary Judgment, arguing that Riley cannot demonstrate a genuine issue of material fact that its proffered legitimate, non-discriminatory, non-retaliatory reasons for her discharge are pretextual.

Having extensively reviewed the voluminous record and considered each individual factual dispute raised by Riley, I conclude that although she has repeatedly challenged the validity of the discipline received, she has not presented any record evidence that St. Mary's reasons for terminating her employment were in fact motivated by discriminatory or retaliatory animus. Accordingly, I find that there are no *material* issues of fact that would allow a

1

reasonable juror to find in Plaintiff's favor, and Defendant is therefore entitled to judgment as a matter of law.

I.      Factual Record[1]

Plaintiff Denise Riley was born on May 4, 1951.  Pl. Dep. at 40.  She has been a licensed nurse since May of 1995.  *Id*. at 64.  Riley worked as a registered nurse ("RN") at St. Mary from 2004 until her termination in January of 2013.[2]  *Id.* at 72–73, 77.  Riley was 61-years-old at the time of her discharge.  Over the tenure of Riley's employment with St. Mary, she received numerous favorable performance evaluations.  Her job performance was rated as "meets or exceeds expectations" in every category of her annual performance review in 2005, 2006, 2008, 2009, and 2010 by prior managers Marsha Gray, Janet Montes, and Susan Snyder.  Plaintiff's Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition Brief") at Exhibits G–K.[3]

Despite these favorable reviews, over the course of her employment, several managers disciplined Riley for "unsatisfactory performance."  *See* Defendant St. Mary Medical Center's Memorandum of Law in Support of its Motion for Summary Judgment ("Defendant's Brief") at Exhibit 9–10, 12–14 (Corrective Action Notices from 2004, 2005, 2010, and 2011) and Exhibit 17 (2012 memorandum documenting complaints of four different staff members regarding Riley's job performance and problems noted by interim supervisor Jim Gentile).  For example,

---

[1] In considering all evidence in the light most favorable to Plaintiff, I have given careful consideration to each issue highlighted in Riley's opposition papers.  Because Riley challenges essentially every piece of evidence that depicts her job performance in a negative light, the vast factual record is recited here in painstaking detail.

[2] Plaintiff's employment at St. Mary was continuous other than a six-month return to her former post at a sister hospital in 2007.  Pl. Dep. at 64, 70–73, 77.

[3] As clarified by Plaintiff, Defendant's "performance appraisal system is somewhat confusing in that a performance appraisal would be issued in the following year.  For example, what Defendant refers to as Plaintiff's 2011 Performance Appraisal is in actuality issued in June of 2012.  To make the timeline clearer for this case, Plaintiff herein refers to all performance appraisals as the date [that] they were *completed and given to Plaintiff* instead of the time period which the review covers."  Plaintiff's Opposition Brief at 2 n. 1.  For the sake of simplicity and clarity, this opinion adopts Plaintiff's method for referencing performance appraisals.

Riley received disciplinary counseling for failing to wear gloves when removing a patient's IV, making inappropriate comments to a patient, failing to show good judgment in emergency situations, lacking compassion towards a patient's family, and generally for being negative and not acting as a team player. *See id.* and Pl. Dep. at 136–37.

During her deposition, Riley testified that while working in the Ambulatory Surgery Unit ("ASU") in late 2009 or early 2010, co-worker Nina Mailey told her that she was "too old" and "too weak" for the ASU. Pl. Dep. at 28–30. Mailey allegedly repeated these statements in front of Susan Rohn, a member of Defendant's Human Resources ("HR") department at the time. *Id.* at 33. Riley also claims that Mailey said, "A lot of people are waiting for you to retire." *Id.* During a meeting with HR on April 1, 2010, Riley informed Rohn of specific instances where she felt she was discriminated against by Mailey because of her age. *Id.* at 321–22. Although St. Mary maintains policies prohibiting discrimination and retaliation on the basis of any protected category, including age, Riley did not learn of any corrective action taken by HR in response to her complaint of age discrimination. *Id.*; Defendant's Brief at Exhibit 6 (St. Mary's Employee Handbook explaining the Compliance Program and Code of Conduct). Riley alleges that Mailey continued to make similar derogatory comments to her throughout 2010–2012. *Id.* at 111.

St. Mary employs a "Corrective Action" policy "to address any unacceptable or inappropriate colleague behavior or performance." *Id.* at Exhibit 8, P0073. Appropriate corrective action is based on a variety of factors, including the "nature of the infraction, previous disciplinary history, colleague status and length of service." *Id.* The policy includes the following four types of corrective action: (1) documented verbal counseling – oral counseling for minor offenses that are documented in writing by the department head; (2) written warning – requiring the employee and the supervisor to sign a Corrective Action Notice following verbal

counseling for a more serious offense; (3) final written warning – following a written warning and requiring an action plan documenting expectations for improvement and consequences for continued infractions; and (4) termination – following previous warnings or, if the offense is serious enough, employees may be terminated without previous counseling or written warnings. *Id.* at P0075.   Although the four levels of corrective action are outlined as disciplinary options, St. Mary's policy explicitly allows for termination of "any colleague at any time with or without any cause and with or without prior notice."  *Id.* at P0073.  The policy later states, "Under certain conditions, the corrective action process may be accelerated depending on the seriousness of the offense.  If the colleague's behavior or policy infraction cannot be tolerated and/or may be a threat to the health or safety of a patient, colleague, or visitor, or may damage the reputation of the Medical Center in the community, immediate termination may be warranted."  *Id.* at P0074.

Riley challenges the validity of two Corrective Action Notices dated August 24, 2010, suggesting that the discipline was unwarranted and the timing was suspicious given her April 1, 2010 complaint of age discrimination to HR.  Plaintiff's Opposition Brief at 6–7; Pl. Dep. at 136–41.  Specifically, Riley suggests that the notices were unnecessarily harsh, as she was disciplined twice for failing to wear gloves when removing a patient's IV.  *Id.*  The two August 24, 2010 Corrective Action Notices both reference the August 18, 2010 incident where Riley "failed to follow universal precautions when removing an IV from a patient," but the second Corrective Action Notice focuses not just on her failure to wear gloves, but also on Riley's "inappropriate comment" to the same patient asking if "he had any contagious diseases" after he bled on her hands.  Defendant's Brief at Exhibit 12–13.  In turn, the "expectation for improvement" differs in the two August 24, 2010 Corrective Action Notices: one focuses on "following universal precautions," while the other focuses on the distinct expectation that Riley

4

cease making inappropriate comments to patients in violation of company values. *Id.* Despite this distinction in the plain language of the Corrective Action Notices, Riley testified during her deposition that St. Mary's disciplinary response here was atypical and duplicative, "I've never even heard of it to get two pink slips for the same thing, a verbal and a written. Okay? So that is very – that is not what other younger nurses would get." Pl. Dep. at 137–38. Riley further testified that HR representative Rohn told her that it is "very unusual" to receive two pink slips for one incident. *Id.* at 138.

Riley similarly contests the validity of the 2011 Corrective Action Notice, emphasizing that the original corrective action, "Final Written Warning," was downgraded to a regular "Written Warning." Pl. Dep. at 143–47. Riley testified that she made a pre-surgery documentation error based on "a very common practice," which ultimately led management to the conclusion that the heightened disciplinary action represented by a Final Written Warning was unfair. *Id.* Riley's testimony does not challenge the underlying facts related to this disciplinary incident, but only the severity of the initial corrective action, emphasizing the ultimate result that the corrective action was reduced one grade. *Id.*

In 2012, Riley's former manager Joyce Roman issued a poor performance review that Riley purports to be largely inaccurate. *Id.* at 152–53, 157–59; Defendant's Brief at Exhibit 18 (Riley Performance Appraisal dated 6/1/12). The review's "Manager Comments" includes the following:

> Denise will be placed on an action plan due to manager's observations as well as previous Interim managers' observations and colleague input. Denise consistently demonstrates problems with organization, efficiency and teamwork. She has been observed responding to patients and their families in an inappropriate manner and a common complaint with co-workers is that she frequently mumbles negative comments under her breath. . . . Denise does not contribute to a team environment and creates a burden on her co-workers by her inability to function independently. . . . [In one instance, she] refused to take a patient, forcing her co-worker to take

both of them in addition to her other 2 patients.  In another instance, Denise continually asked another nurse who was precepting a new colleague to assist her with patients, even though she had fewer patients than department ratio permits. . . . Complaints by colleagues and visitors alike about Denise's lack of tact and diplomacy. . . Some recent examples of why Denise falls short of [providing the best possible service to customers/patients] are asking a parent to hold pressure to an IV site and then failing to provide the patient's family with slings.  Also, as noted elsewhere, refusing to answer a patient's question during the pre-op phone call because she had "too many other calls to make."

*Id.*  When questioned about various specific examples of unacceptable work behavior from the 2012 performance review, Riley testified that the factual scenarios were "false" and/or that she did "not recall exactly what happened."  Pl. Dep. at 152–59.  Specifically, Riley maintains she did not act harshly or abruptly around patients or other staff members.  *Id.* at 153.  Riley concedes that she has been known to mumble under her breath, but explains her mumbling was limited to "like, oh boy, stuff like that.  Never curse words or anything like that, never.  Just, you know, general stuff that people mumble having a bad day."  *Id.* at 152.

For the first time in her career as an RN, Riley did not receive an annual pay increase as a result of the 2012 evaluation.  Pl. Dep. at 214–15.  In response, Riley submitted a written complaint of age discrimination dated June 5, 2012 challenging the accuracy of the 2012 review.  Plaintiff's Opposition Brief at Exhibit Q (Riley's five page written complaint dated June 5, 2012).  Riley's written complaint avers that the examples of unsatisfactory behavior listed in her review were the result of hearsay from a select group of co-workers, and information from a larger pool of co-workers would have cast doubt on the veracity of those allegations.  *Id.*  Riley also noted her positive Performance Appraisal for the prior year, which led her to question "how in one year I could have gone that bad, after reading this review I'm beginning to believe the reason is I got one year too old."  *Id.*  She further claimed she was "stunned" by the allegations in her review.  *Id.*  Riley asserted that she was not on notice of any problems that could impact her

6

employment prior to her 2012 evaluation, as she was not "progressively notified at the time of each alleged occurrence." *Id.*  Riley's written complaint concluded that her 2012 evaluation "was put together with an agenda in mind, based on hearsay from a previous manager, current charge nurses and certain co-workers. . . . It is my opinion that this review is showing a pattern of age discrimination." *Id.*

Riley also discussed her concerns regarding the validity of the review directly with Joyce Roman.  Pl. Dep. at 165–66.  Roman conceded that the review could be construed as a "peer review" since Roman did not witness Riley's work performance directly, but she did not otherwise react to Riley's complaints of age discrimination or retract any portion of the review. *Id.*  Riley testified that Roman "was very cold.  And she said, you will go on the [Communication and Re-education Strategies ("CARES")] program.  You are on a 90 day [probation]." *Id.* at 166.  When Roman was questioned about this interaction during her deposition, she characterized it differently than Riley, explaining, "It was a passing comment that was made, we had a little discussion about how old she actually was compared to how youthful I thought she looked, and that was the end of it."  Roman Dep. 53–54.  When questioned further by counsel, Roman testified, "Denise did not pursue the issue with me to the extent that I would have felt that it warranted further investigation or discussion." *Id.*  Also notable, Roman testified, "Anything that I reviewed with Denise[,] her immediate response to everything was[,] did Nina [Mailey] tell you that, and whatever it was we discussed, Nina [Mailey] had nothing to do with, hadn't reported anything to me, hadn't voiced any concern to me, . . . because [Denise] was convinced that all of this was cooked up by Nina [Mailey]." *Id.* at 47–48.

Riley's written complaint precipitated a meeting between Riley, HR Director Donna Marino,[4] and then-Director of Surgical Services Karen Benedict, Roman's supervisor, where Riley reiterated her concern that the 2012 performance review was "secondary to her age." Benedict Dep. at 27–28, 37.  When questioned about the accuracy of the 2012 review during her deposition, Benedict testified that she personally observed many of the behaviors and unsatisfactory performance examples referenced in the review.  *Id.* at 38–40.  As a result, when asked whether she attempted to corroborate the allegations in the 2012 review, Benedict testified, "Well, as I said earlier, many of these I had witnessed myself, her curtness, her rudeness, her refusal.  These are things that I had actually seen myself.  There were things that I had intervened to help with patient care.  So as far as investigating, I didn't need to investigate.  I had actually seen these behaviors myself."  *Id.*  Concerned that her complaints of discrimination were not being adequately addressed, Riley complained up the management ladder to Benedict's supervisor, Vice President of Nursing Sharon Brown.  Pl. Dep. at 183–84; Plaintiff's Opposition Brief at 9 (clarifying Brown's official title).  According to Riley, Brown responded that "she was going to look into it" and "get it straightened out."  Pl. Dep. at 184.  Brown allegedly further advised, "I don't think you have anything to worry about."  *Id.*

As suggested by Roman verbally and in the 2012 evaluation, Riley was placed on a CARES Plan on June 13, 2012.  *See* Defendant's Brief at Exhibit 20 (6/13/12 CARES Plan).  Roman wrote, "This Communication and Re-education on Strategies Plan is being implemented today for Denise Riley in response to her unsatisfactory performance as an ASU nurse and which was reflected in her most recent performance appraisal.  The performance of this CARES Plan is

---

[4] Plaintiff's Opposition Brief highlights an alleged contradiction in the record in that Donna Marino "astonishingly" denied having any knowledge of Riley's complaints of age discrimination prior to the filing of this lawsuit. Plaintiff's Opposition Brief at 9 (citing Marino Dep. at 31–37).  As explained at length later in this opinion, I am not persuaded that any of the alleged inconsistencies Plaintiff raises are material to my analysis of whether the decisionmaker in question here was motivated by discriminatory animus in terminating Riley's employment.

to assist Denise so that she can satisfactorily meet expectations and competencies required of her." *Id.*

In August 2012, Donna McNeill became Nurse Manager of the ASU.  McNeill Dep. at 36.  McNeill holds a Master's Degree in Nursing from Thomas Edison State College, and a Bachelor's Degree in Nursing from LaSalle University.  *Id.* at 8–9.  McNeill began her employment at St. Mary as a Staff Nurse in 1996.  *Id.* at 10.  She was promoted to Orthopedic Program Coordinator in 2003, a position she held until her 2012 promotion to Nurse Manager of the ASU.  *Id.* at 11–12.  As Manager of the ASU, McNeill was responsible for overseeing staffing and care of patients, being a liaison between surgeons, staff and patients, and managing performance improvement measures with a focus on quality outcomes.  *Id.* at 13.

When asked during her deposition if she had knowledge of her direct reports' disciplinary records upon taking her on her new role as Nurse Manager of the ASU, McNeill testified, "everyone had a clean slate in my mind and in my opinion when I came on.  There were 45 employees.  Two things: One, I wasn't going to go through their record; two, it's only what I witnessed.  I wouldn't dare go by what someone else might have." *Id.* at 27–28.[5]  Several new disciplinary incidents involving Riley occurred under McNeill's watch.  On September 19, 2012, McNeill allegedly witnessed Riley speaking loudly and rudely to a patient over the phone. McNeill Dep. at 54–55; Defendant's Brief at Exhibit 21 (9/26/12 Corrective Action Notice).  In response, McNeill issued Riley a written warning for unsatisfactory performance.  *Id.* Explaining the incident, McNeill testified,

---

[5] Plaintiff emphasizes another alleged contradiction in the record regarding the deposition testimonies of defense witnesses, arguing that Roman testified that she discussed performance concerns of individual nurses with McNeill as part of her transition into her new role.  Roman Dep. at 17–25.  Defendant spends a significant portion of its Reply Brief debunking this alleged inconsistency and arguing that Plaintiff's Opposition Brief repeatedly mischaracterized the voluminous record in this case.  *See* Defendant's Reply Brief at 1, 5–8. While Plaintiff's position regarding the potential contradiction has been noted, in viewing the record evidence as a whole, there are no inconsistencies that have a material impact on my analysis.

I am all about kindness.  I am all about respect.  I am all about the patient.  And my mouth dropped when I heard the way [Riley] was talking to a patient.  It was awful.  We are in the [business] of caring for people, putting them at ease, we're taking care of them at their worst possible moments.   And the behavior that I witnessed, the way she was talking to him, it was just unacceptable, it was nothing that any patient or family member should have to go through when they're seeking [care and help] . . . [Riley was yelling] at the patient, nasty to the patient, didn't care if he cancelled his surgery, there was nothing helpful. . . . She was not being supportive.  She was not trying to help him with the situation.  She wanted to dismiss it.  It was appalling.

McNeill Dep. at 54–55.  While conceding that McNeill "was right there next to [her]" and "it might have appeared that I was talking too loud to [the patient]," Riley has consistently maintained that she did not yell at the patient.  Pl. Dep. at 208–09; *see also* Defendant's Brief at Exhibit 21 (explaining the 9/19/12 incident, McNeill wrote, "I then called Denise to a private area and counseled her that she can't lose patients or yell at patients.  Denise did not feel that she yelled.").

Following the September 26, 2012 incident, McNeill also placed Riley on a CARES Plan under her supervision.  Defendant's Brief at Exhibit 22 (9/26/12 CARES Plan).  McNeill testified that the purpose of the CARES plan was to help Riley improve her job performance.  McNeill Dep. at 61–64 ("[A CARES Plan] is an opportunity to help somebody . . . it isn't something that leads them to termination.  It's actually supposed to do the opposite.").  Riley herself also concedes that McNeill was trying to help her.  Pl. Dep. at 213.  As part of her second CARES Plan, Riley was required to meet weekly with McNeill in order to track her progress and allow McNeill to offer support should Riley find herself struggling to improve in any of the identified areas.  *Id.*; Defendant's Brief at Exhibit 22 (requiring Riley to complete continuing education in the areas of communication, compassion and customer service).  Though Plaintiff met the requirements in some of areas of the program, McNeill noted that Riley still needed to show improvement in the area of interacting with patients and colleagues.  Defendant's Brief at

Exhibit 24 (CARE Plan annotated by McNeill on October 11, 2012 showing Riley met minimum requirements in most of her focus areas but still needed to improve her performance in the category of demonstrating "sympathy and empathy when interacting with all patients and colleagues").

On October 9, 2012, McNeill issued Riley a documented verbal warning after a patient complained that she received poor discharge instructions on October 3, 2012 and felt the post-op nurses ignored her needs. Defendant's Brief at Exhibit 27 (10/9/12 Corrective Action Notice). Judy McBride, the primary post-op nurse present at the time of this incident, received an almost identical documented verbal warning. *Id.* at Exhibit 29 (10/9/12 Corrective Action Notice addressed to Judy McBride including the same explanation as Riley's 10/9/12 Notice). Riley again challenges the validity of this discipline, emphasizing that she was not the primary nurse caring for the patient who complained. Pl. Dep. at 216, 220 ("This wasn't me . . . under no circumstances should I get [disciplined] if I'm just sitting next to [the primary nurse] taking care of my patients. . . You see what happens is when they did write somebody up if I was sitting next to them they brought me [in] on it."); Defendant's Brief at Exhibit 27 (clarifying, "Denise was not the primary nurse caring for the pt"). McNeill's October 3, 2012 typewritten notes documenting this patient complaint state, ". . . patient reported both post op nurses as being inattentive to her needs. . . . She reported she could hear the nurses' conversations which were personal in nature as they were sitting at the desk instead of checking on their patients. . . . Nurse who discharged pt: Judy McBride.  2nd nurse in SDS post-op: Denise Riley." Defendant's Brief at Exhibit 28.

McNeill documented another patient complaint regarding a negative post-op experience from October 3, 2012 where Plaintiff was the primary nurse. Defendant's Brief at Exhibit 30

(McNeill's typewritten notes documenting the complaint, including but not limited to: "Asked nurse to help her with the tongue in her shoe, to which the nurse said yes, but didn't.  Reported discharge instructions were not very good.  Pt. wasn't sure what she should do after she got home. . . . had to ask volunteer for a drink because nurse was not checking on her. . .  Nurse who discharged pt: Denise Riley"); *see also* Exhibit 31 (St. Mary's annotated post-discharge ASU follow-up phone call script dated 10/3/12).  During her deposition, Riley explained that the underlying facts of this second incident were "silly," leading her to the conclusion that the disciplinary action was motivated by retaliation.  Pl. Dep. at 222 ("They brought this up to me about a tongue in a shoe . . . this is silly.  A flap in the [shoe].  This is what I'm talking about retaliation.").   McNeill, however, explained why Riley's conduct here was significant from a management perspective, "this may seem [like] not really a big deal to you about not fixing somebody's tongue in a shoe.  But from someone that had anesthesia and might be on pain safety, we're worried about safety and balance and walking and falling. . . . if a patient complains their footwear is not on correct, we're putting that patient at risk for losing balance, tripping and falling.  So it's a patient safety concern and it's also that she said she would and she didn't." McNeill Dep. at 74–75.

On December 10, 2012, McNeill issued a final written warning to Riley for a November 28, 2012 incident where Riley allegedly engaged in "unsafe practice" with a post-op patient. Defendant's Brief at Exhibit 32 (12/10/12 Corrective Action Notice).  Riley's final written warning reads:

> Explanation: Taking care of patient post-operatively who had a myelogram performed.  Attempted to get patient out of bed with assistance of another nurse. Patient's legs gave out from under her and two nurses had to strain to prevent patient from falling.  Patient later reported to charge nurse that she told Denise her legs felt numb, but Denise told her to try to get up and walk to the bathroom anyway.

Expectation for improvement/Action plan: Any deviation from Professional Quality Nurse Care, Any deviation from St. Mary Policy and/or Procedure, any further incident or complaint will result in termination.

*Id. See also* McNeill Dep. at 78–81 (". . . the patient was crying.  She was very upset that her legs gave out.").  Riley again characterizes the underlying facts that led to disciplinary action differently.  Riley testified that she "saved the patient from falling and still got in trouble for it." Pl. Dep. at 246–47.  She explained that the patient was "doing great" and had to go to the bathroom.  *Id.* at 226–27.  Riley offered to get a wheelchair, but the patient had a cane and said she was fine.  *Id.* at 227.  Riley claims she performed the neuro assessment and required the patient to "stand in place and march in place," before walking.  *Id.*  Then, the patient walked "about 6 to 8 feet perfectly fine.  And then all of a sudden her legs gave out.  So I prevented her from falling.  And I asked another RN to help me."  *Id.*  When asked to clarify the details of this incident, Riley specified that the patient "started to say I feel a little dizzy," so Riley called out for Nurse Anne Harkins, who helped her get the patient into a wheelchair.  *Id.* at 228–29.  After helping the patient back to bed, Riley was relieved by Nurse Mailey in order to go to lunch.  *Id.* at 230.  As a result, Riley did not have a chance to document the neuro assessment, which she identifies as the real "problem" that triggered disciplinary action.  *Id.*

When Riley returned from lunch, the patient was crying hysterically, with Nurse Mailey and Nurse Beth Sharp at her bedside.  *Id.*  Riley was informed that Nurse Harkins went down to the Emergency Room ("ER") for an examination.  *Id.*  Riley was advised that she should also get checked to make sure she did not injure herself when preventing the patient from falling.  *Id.* Riley's back felt "a little funny," so she agreed to go to the ER for an examination, where she was treated for inflammation.  *Id.* at 231.  Although Riley's injury did not require her to take leave from work, Nurse Harkins' more serious injuries qualified her for workers compensation

13

leave.  *Id.*  Riley theorizes that St. Mary was upset that Harkins received workers compensation. *Id.*  She also testified that the patient was "coerced by Nina [Mailey] and the charge nurse," Beth Sharp, to bring her complaint against Riley.  *Id.* at 232.  Riley further characterized the patient's complaint, as "crazy," reasoning, "Why would I get someone out to fall?"  *Id.* at 232–33.

McNeill was called to the scene to investigate the November 28, 2012 incident.  McNeill Dep. at 79–80.  The patient was crying, and "said she told Denise she couldn't feel her feet."  *Id.* at 81.  After Riley returned from lunch, McNeill also spoke with her directly and documented notes from their conversation.  *Id.*; Defendant's Brief at Exhibit 32.  McNeill's notes largely track Riley's story, including her performance of a neuro check that tested sensitivity by requiring the patient to march in place.  *Id.*  McNeill's handwritten notes conclude by quoting Riley's response, "Why would I get her up if she couldn't move her feet?"  McNeill's investigation of this incident, which also included reviewing the patient's chart and reviewing the relevant standards of care, revealed that Riley failed to follow proper standards of care before standing the patient up.  *Id.* at 81–84.  According to McNeill, Riley did not perform a "full neuro check."  *Id.*  When questioned about the neuro check specifically, Riley responded that she did "some of it" and conceded that she did not document it.  *Id.*  Riley defended her behavior by saying that "other people don't document."  *Id.*

McNeill further testified that had Riley performed a full neuro check, it "would have revealed that the patient was not safe to ambulate at that time."  *Id.* at 84–85.  When specifically questioned by counsel whether Riley's account of this incident would satisfy proper standards of care, McNeill testified that "the steps that [Riley] described" were "insufficient," because the limited neuro test that Riley performed only accounted for "one out of like six" assessments required for a full neuro check.  *Id.* at 85–87.  For example, Riley's neuro check did not address

strength, did not examine whether the patient could move her legs, and did not check for capillary refill. *Id.* Moreover, according to McNeill, marching in place is not part of a proper neuro check, as the patient should not stand until a neuro check has established that it is "safe to get them up." *Id.*

On December 18, 2012, Patient Advocate Angela Corsello e-mailed McNeill about a complaint from the family of an 80-year-old patient who had a surgical procedure on November 30, 2012. Defendant's Brief at Exhibit 1. The patient's daughter called to convey that "her family [was] very upset with the behavior and interaction with her mother's nurse and her name was 'Reilly.' " *Id.* Corsello took thorough notes documenting the telephone conversation. *See id.* Among other grievances, the family complained that Riley showed "no compassion" for the patient's discomfort, spoke in a "nasty, curt tone of voice," and kept encouraging the patient to "get up and move" despite her feeling "sick/ill" and "dizzy." *Id.* According to the complaint, when asked why she was being "so rude to the patient and family," Riley allegedly replied that she had to get the patient "moving so she can go home . . . because the staff was getting a new round of patients coming in." *Id.* The complaint concluded that Riley "was insane, ridiculous, and there was no reason for her behavior." *Id.* The same family reported that the staff in pre-op, in contrast, was "wonderful." *Id.*

When questioned about the November 30, 2012 family complaint, Riley did not dispute treating the specific patient referenced, but again challenged the characterization of her behavior, suggesting that Corsello was coerced. Pl. Dep. at 238–40; Defendant's Brief at Exhibit 1 (handwritten notes, "Denise states she was 'very nice to family + allowed 2–3 at a time back to P.O.' "). Riley explained, "I don't even know who [Angela Corsello] is. I mean, this is coerced or subjective . . . I don't know if [Corsello] was connected – if she was friends with Nina

15

[Mailey] and Jim Gentile and Karen Benedict or any of them. . . . But I could never be that type of nurse – never. . . . that letter is a joke." *Id.* at 240–42. In response to counsel's questioning regarding her allegations of coercion, Riley testified, "You could easily coerce a family . . . They are calling me Riley here. No one in the world ever called me nurse Riley." *Id.* at 252. Riley hypothesized that someone may have suggested, "did Denise do this?" *Id.* When pressed further about her coercion theory, Riley essentially conceded that the patient complaint may have been authentic, testifying, "there are family members that you cannot make happy. It is not Disney World. They see their mother in pain. . . . and they are family members that are just not really great people. That's all I can say. And apparently this person, if she did write this about me, it's not true." *Id.* at 252–53.

On December 27, 2012, McNeill suspended Riley pending an investigation. *Id.* at 249–50. The Corrective Action Notice references four incidents dated November 15, November 28, November 30, and December 7, 2012, comprised of three patient/family complaints and the November 28, 2012 patient safety incident. Defendant's Brief at Exhibit 34. The Notice also lists previous warnings issued on June 13, 2012, September 26, 2012, and October 9, 2012. Shortly thereafter, McNeill recommended Riley's termination. McNeill Dep. at 38. Following her recommendation for termination, McNeill "pulled the data and the paperwork together," and arranged a meeting with her supervisor, Karen Benedict (Director of Surgical Services), and HR Director Donna Marino to ensure that they agreed Riley's termination was warranted. *Id.* at 30–31, 42. They discussed Riley's prior disciplinary write-ups and patient and family complaints. *Id.* at 41. McNeill testified, "I remember talking about would we feel safe if she took care of one of our patients . . . we didn't feel she was a safe practitioner and she certainly didn't have the customer service skills that are needed when you're dealing with patient and family members,

especially in situations like this. . . . it's all about the patient and you need to focus on them, and unfortunately . . . she didn't change her actions or behaviors." *Id.* at 41–42.  Nurse Mailey was not present at this meeting and had no involvement in the decision to terminate Riley.  *Id.* at 38–42.

Accordingly, on January 3, 2013, St. Mary terminated Riley's employment.  Pl. Dep. at 256; Defendant's Brief at Exhibit 38 ("Explanation: Repeated patient and patient family complaints regarding communication and care with unsatisfactory improvement.  Unsafe practice and lack of documented neurological checks on patient prior to ambulating, putting patient and staff member at risk for injury on 11/28/12.").  When McNeill told Riley that "after careful review," St. Mary decided to terminate her, Riley replied, "this is age discrimination." Pl. Dep. at 257.  Riley subsequently cross-filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission, which included her complaints of age discrimination and retaliation.  Defendant's Brief at Exhibit 39.

II.     Discussion

    **a.  Summary Judgment Standard**

Defendant has moved for summary judgment, arguing it is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact warranting submission to a jury.  *See* Fed. R. Civ. P. 56.  To defeat summary judgment, the non-movant must respond with facts of record that contradict the facts identified by the moving party and may not rest on mere denials.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 n.3 (1986); *First National Bank of Pennsylvania v. Lincoln National Life Insurance Co.,* 824 F.2d 277, 282 (3d Cir.1987).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find

17

for the non-moving party, and a factual dispute is "material" only if it might affect the outcome under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  It is well established that all record evidence must be construed in the light most favorable to the non-moving party. *Id.* at 261, n.2.

### b.   Summary of Arguments

#### i.   *Defendant's Position*

St. Mary argues that there is no evidence to suggest that any of the reasons for discharge—Riley's risk to patient safety, multiple and continuing complaints about her negative attitude from various sources, her failure to improve her behavior after being placed on CARES Plans—are false.   Defendant's Brief at 19–20.  Further, St. Mary argues that there is no evidence to show that McNeill knew or had any reason to know that any of the complaints made of Riley were baseless, nor is there evidence that the patients or families harbored age discriminatory bias. *Id.* at 20.  Moreover, St. Mary cites other employees—of varying ages—who received written warnings from McNeill for unprofessional behavior and negative attitudes and were subsequently fired by the hospital.  *Id.* at 22; Defendant's Brief at Exhibits 41–44 (Corrective Action Notices for terminated employees born in 1965, 1966, 1978, and 1985).  For instance, the employee born in 1985 was discharged due to unsatisfactory performance in the areas of "patient safety/satisfaction." *Id.* at Exhibit 42.  Specifically, she failed to send a specimen to the lab, which required the patient to return to the hospital to have her blood work done for a second time.  Exhibit 42.  Prior to this incident, the employee received a final written warning where her "Expectation for improvement/Action Plan" consisted of "1) No further incidents of patient callbacks; 2) Maintain a positive, friendly attitude; 3) Be willing to accept additional work/tasks as needed to assist the department. "  *Id.* at Exhibit 48.

There are many other examples in the voluminous record in this case that McNeill held those who reported to her accountable by consistently issuing performance based discipline. *See*, *e.g.*, *id.* at Exhibits 29, 46, 49–55 (employee disciplinary records, including 20+ Corrective Action Notices issued by McNeill to other employees for "unsatisfactory performance," "patient safety," "patient feedback," and/or "inappropriate behavior"). Further, the average age of employees working in the St. Mary ASU was 53 when last calculated during discovery. *See* Defendant's Brief at Exhibit 45 (listing the birth years of St. Mary ASU personnel as of November 2014). During her deposition, Riley conceded that she is not aware of any nurse engaging in a "minor infraction" and not being disciplined by McNeill for the conduct involved. Pl. Dep. at 202.

Defendant emphasizes that Riley's focus on Nina Mailey—a non-managerial level employee who played no role in the decision to terminate Riley—is a "red herring."[6] Defendant's Brief at 24–25. Given that Mailey played no role in the ultimate decisionmaking process, Defendant contends that her comments at most constitute so-called "stray remarks," which are further weakened by their remote temporal proximity to Riley's actual termination. *Id.* Defendant therefore concludes that any discriminatory animus allegedly on the part of Mailey is not enough to support an inference of discrimination. *Id.* Finally, St. Mary submits that Riley's personal belief that the decision to terminate her employment was motivated by unlawful animus is not enough to create a triable issue of fact absent competent record evidence supporting an inference of discrimination. *Id.* at 25.

---

[6] I also note that Mailey was born in 1956, making her only five years younger than Riley. *Id.* at Exhibit 56, ¶ 4 (Declaration of St. Mary HR Director Donna Marino).

With respect to Riley's retaliation claim, Defendant argues that she has failed to establish a *prima facie* case of retaliation.[7]   In addition, in the event this Court finds that Riley has established a *prima facie* case of retaliation, St. Mary contends that she has failed to create a genuine issue of material fact for trial that Defendant's legitimate reasons for her discharge were pretext for unlawful retaliation.  *Id.* at 30–31.

        *ii.   Plaintiff's Position*

Riley relies on the same arguments in support of pretext for both her discrimination and retaliation claims.  *See* Plaintiff's Opposition Brief at 27.  First, Riley challenges the credibility of St. Mary and decisionmaker McNeill based on alleged inconsistencies in the record. Specifically, former employee Roman testified that she discussed the nurses in the ASU with McNeill for at least one month, which McNeill omitted, perhaps intentionally, from her deposition.  *Id.* at 22; *see supra n. 5.*  She further argues that McNeill skipped various steps in St. Mary's progressive disciplinary policy, and Defendant's failure to follow its own policy supports an inference of pretext.  Plaintiff's Opposition Brief at 22.   Riley also argues that patient complaints "almost never" resulted in written discipline during her tenure at St. Mary, attaching four post-deposition Certifications of former St. Mary employees.  *Id.* at 11, Exhibit R (Certification of Lisa Braun), Exhibit S (Certification of Ronald Maisano, also discharged from

---

[7] Specifically, St. Mary argues that Riley cannot meet her burden to establish a *prima facie* case that her termination was caused by her June 2012 complaint of discrimination.  Defendant's Brief at 27.  First, Defendant asserts that McNeill was unaware of Riley's age discrimination complaint, which was made three months before her appointment as manager of the ASU.  *Id.* at 27.  Second, Defendant claims that the more than six-month period between Riley's June 2012 complaint and January 2013 discharge is too long to support an inference of discrimination based on temporal proximity alone.  *Id.* at 29.  In addition, although Riley testified that she complained of age discrimination in response to receiving oral notice of her discharge, this alleged complaint is irrelevant, as the undisputed record shows that St. Mary had already made the decision to terminate Riley before McNeill informed her of the decision.  *See Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006) ("If subsequent conduct could prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress.") (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).  Accordingly, Defendant argues that Riley would have to come forward with record evidence in support of a retaliatory motive for her discharge, which she has simply failed to do.  Defendant's Brief at 29–30.

St. Mary in January 2013); Exhibit T (Certification of Rosemarie Lindsey, also discharged from

St. Mary in May 2013); Exhibit U (Certification of Tricia Stoner-Panto, also discharged from St.

Mary in May 2011).[8]

Next, Riley cites her previous favorable evaluations to cast doubt on Defendant's reasons

for her termination, arguing that a "jury could certainly infer that it is unreasonable to believe

that a **near 10-year employee who had always performed favorably suddenly had such**

**pervasive and uncontrollable problems that she was repeatedly disciplined and terminated**

**for performance reasons over the course of 6 months**." *Id.* at 23–24 (emphasis in original).

As reflected in this opinion's synopsis of the extensive factual record, Riley also disputes

"essentially every discipline she was given." *Id.* at 24.   Finally, Riley argues that the record as a

whole supports an inference of pretext.   *Id.* at 25.   Riley's Opposition Brief summarizes the

"record as a whole" as follows:

> . . . it is clear that Ms. Riley was [sic] well-rated employee for almost a decade
> that complained of age discrimination in June 2012 because she had received any
> [sic] abysmal, untrue performance review.  Ms. Riley complained to four (4)
> individuals, following the chain of command up from her supervisor to the vice
> president of nursing.  Soon after those complaints, Donna McNeill began to
> supervise Ms. Riley.  Although McNeill's predecessor, Joyce Roman, was
> instructed [sic] on the ambulatory surgery unit when she began, McNeill claimed
> that she was no [sic] told about the performance of any of the nurses on the unit

---

[8] These four Certifications are the subject of a defense Motion to Strike and for Sanctions.  Although I have noted
the irony in Plaintiff's reliance on Certifications from three employees who were also terminated from St. Mary in
support of her argument that St. Mary "almost never" disciplined employees for certain conduct, in construing the
record in the light most favorable to Riley, I have taken into account the *limited* import of the four Certifications in
light of the fact that none of these employees reported to McNeill.  *See* Defendant's Motion to Strike at Exhibits E–
H (deposition transcripts for these witnesses).  Perhaps exemplifying the limited application of this evidence to my
analysis of the record as a whole, when Braun was questioned during her deposition whether Riley discussed her
relationship with McNeill, Braun replied, "No, I don't even recollect that name."  Exhibit R, Deposition of Lisa
Braun, at 76.  Counsel was even more specific when questioning the other three witnesses who all expressly testified
that they had no knowledge of how McNeill handled patient complaints.  *See* Exhibit F, Deposition of Ronald
Maisano, at 22–23 ("Q. Would I be correct that you have no knowledge or information regarding disciplinary
actions imposed upon employees in the ambulatory surgery unit by Donna McNeill? A. That would be correct. . . .
Would I also be correct that you have no knowledge regarding discipline being imposed by Donna McNeill in the
ambulatory surgery unit for patient complaints of rudeness? A. That would be correct."); Exhibit G, Deposition of
Rosemarie Lindsey at 23–24 (almost identical questions and answers regarding the witness' lack of knowledge of
McNeill's disciplinary practices); Exhibit H, Deposition of Tricia Stoner-Panto at 43–44 (same).

until she began.  Joyce Roman directly contradicted this and stated that she
instructed McNeill for at least one month.  **Within a matter of weeks, McNeill
issued an untrue corrective action notice and a CARES probationary plan to
Ms. Riley.  From there, McNeill continued to pepper Ms. Riley with untrue
discipline up until the point of her termination.**

*Id.* (emphasis in original).

### c.  Legal Analysis

Although Plaintiff's counsel has seemingly advanced every viable argument to defeat

summary judgment, there is simply no record evidence of a *genuine*, *material* factual dispute that

would allow a reasonable juror to find in Plaintiff's favor.  Consequently, St. Mary is entitled to

judgment as a matter of law, as set out more fully below.

### i.  *Plaintiff's Discrimination Claim*

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge

any individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §

623(a)(1).[9]  Age discrimination may be proven through direct or indirect evidence.  *Connors v.*

*Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998).  Because Plaintiff offers indirect evidence

in support of her claims, the *McDonnell Douglas* burden-shifting framework applies.  *Torre v.*

*Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) ("although *McDonnell Douglas* was itself a race

discrimination suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, its

shifting-burden analysis is applicable to age discrimination claims, as well."); *accord Burton*,

707 F.3d at 425–26.

Under the burden-shifting framework, Plaintiff must initially establish a *prima facie* case

of discrimination by a preponderance of the evidence.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d

---

[9] Within the Third Circuit, age discrimination claims brought pursuant to the ADEA and the PHRA are interpreted
identically at the summary judgment stage.  *See*, *e.g.*, *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013).

789, 797 (3d Cir. 2003).  As first articulated in the *McDonnell Douglas* line of cases, and later modified to apply in the ADEA context, Plaintiff will satisfy this burden by showing that: "(1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009)).  For the purposes of its Motion, Defendant concedes that Riley has established a *prima facie* case of age discrimination.  Defendant's Brief at 15.

Once Plaintiff makes her *prima facie* case, the burden of production (but not persuasion) shifts to the Defendant to offer a legitimate, non-discriminatory reason for the adverse action. *Burton*, 707 F.3d at 426; *Smith*, 589 F.3d at 690.  The Third Circuit has recognized that this burden is "minimal" and "relatively light."  *Burton*, 707 F.3d at 426 (citations omitted). Defendant can satisfy this step by providing evidence, which, if taken as true, would permit a finding that it took the adverse action for a non-discriminatory reason.  *Id.*  Defendant need not prove at this stage that its articulated reason for terminating Plaintiff's employment was the actual reason that motivated its decision.  *Shellenberger v. Summit Bancorp, Inc.,* 318 F.3d 183, 189 (3d Cir. 2003).

Here, Defendant easily satisfies this burden.  As set forth earlier in great detail, St. Mary provides a multitude of reasons in support of its ultimate decision to discharge Riley, including the accumulation of patient complaints, Riley's failure to improve her performance after numerous verbal and written warnings, and ongoing patient safety concerns.  Particularly given the serious nature of Riley job's responsibilities as an Ambulatory Surgery Unit nurse, the

hospital has without question set forth a legitimate and non-discriminatory reason for terminating her employment.

After the Defendant successfully rebuts the presumption of discrimination raised by the Plaintiff's *prima facie* case, the burden shifts back to the Plaintiff to demonstrate by a preponderance of the evidence that the employer's purported reasons for termination were pretext for unlawful discrimination. *Sarullo*, 352 F.3d at 797.  In order to demonstrate pretext, the employee "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[10] *Burton*, 707 F.3d at 427 (internal quotation marks and citation omitted); *Sarullo*, 352 F.3d at 799–800; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 645 (3d Cir. 1998) ("For example, the plaintiff may show that the employer has previously discriminated against her, that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.").

It is not enough for Plaintiff to show that the employer's decision was wrong or mistaken. *Brewer*, 72 F.3d at 331.  An employer is permitted to take "an adverse employment action for a

---

[10] There is some uncertainty in the circuits over the level of causation that must be shown following the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  Two non-precedential Third Circuit opinions illustrate the nature and extent of conflicting interpretations of *Gross*.  *Compare Kassem v. Walgreens Corporate*, No. 14-3644, 2015 WL 3876641, at *1 (3d Cir. June 23, 2015) ("we must determine whether Kassem has submitted evidence from which a factfinder could infer that Appellee's stated reasons for the adverse actions were pretext for age discrimination and that his age was the 'but for' cause of his reduced hours or termination.") *with Johnson v. Delaware Cnty. Juvenile Det. Ctr.*, 545 F. App'x 135, 139 (3d Cir. 2013) ("Johnson's claims of [age] discrimination are based on a pretext theory, not mixed-motive and, thus, *Gross* is inapplicable.").   Here, of course Defendant advances the interpretation that *Gross* requires a showing of "but for" causation, while Plaintiff argues that *Gross* does not alter the typical burden-shifting analysis for purposes of summary judgment.  Because Plaintiff has failed to produce evidence that supports even a pre-*Gross* inference of discrimination, the parties' dispute as to the governing legal standard has no impact on my analysis.

reason that is not 'true' in the sense that it is not objectively correct" so long as the employer acted in good faith and not based on unlawful animus. *See Watson v. Southeastern Pa. Transp. Auth.*, 207 F.3d 207, 222 (3d Cir. 2000). "[T]he factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("We have applied the principles explained in *Fuentes* to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision."). Sitting *en banc*, the Third Circuit has clearly instructed that "federal courts are not arbitral boards ruling on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Keller v. Orix Credit Alliance, Inc.,* 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotations, citations, and brackets omitted). Rather, Riley may satisfy this burden by showing that Defendant's proffered reasons are "weak, incoherent, implausible, or so inconsistent that 'a reasonable factfinder could rationally find them unworthy of credence.' " *Sarullo*, 352 F.3d at 800 (quoting *Keller*, 130 F.3d at 1108–09). In other words, Plaintiff satisfies her burden if she shows that "the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it could not have been the employer's real reason.' " *Id.*

So long as Plaintiff has put forth sufficient evidence to allow a factfinder to discredit the employer's justification, "she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427 (citations omitted). "This is because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse

employment action for an invidious reason." *Id.* But, "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal citations omitted). While this fairly rigorous standard places a difficult burden on Riley, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Of particular significance here, at "summary judgment, a plaintiff cannot rely on unsupported allegations." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). *See also Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991) (*overruled in part on other grounds*) ("Merely reciting that age was the reason for the decision does not make it so."). Riley must identify record evidence demonstrating a genuine issue for trial. *Jones*, 214 F.3d at 402. Simply put, because the ultimate inquiry concerns the decisionmaker's mental state, Riley's perception of her own performance is not relevant to my analysis of whether St. Mary was in fact motivated by discrimination. *See, e.g., Simpson v. Kay Jewelers, Inc.*, 142 F.3d 639, 646–47 (3d Cir. 1998) ("The ultimate inquiry is whether the decision was motivated by the affected employee's age. . . . Simpson's view of her performance . . . is not relevant"); *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

In *Smith v. City of Allentown*, for example, the Third Circuit ruled that Plaintiff Smith failed to satisfy this burden in light of evidence that Smith, an at-will employee, clearly received notice of his deficient performance, failed to meet performance goals, produced no evidence that his employer had a mandatory progressive disciplinary policy or deviated from any such policy, and had previously acknowledged that he had no reason to believe the defendant considered his age when deciding to fire him apart from a single age-related comment referencing his fifty-fifth birthday.  589 F.3d at 691–92.  The Third Circuit found persuasive that the decisionmaker consulted with Smith's supervisor and others, "perused" Smith's file, and had otherwise done a thorough review of Smith's performance history, concluding that under "these circumstances, no reasonable jury could agree that appellees terminated Smith on the basis of age discrimination." *Id.* at 692.

Here, despite Plaintiff's counsel's relentless attempts to manufacture a genuine factual dispute, there is simply no evidence that Defendant's decision to terminate Riley had anything to do with her age.  Riley has failed to identify any record evidence suggesting that St. Mary's reasons for terminating her employment were false or pretextual.  Riley's sole piece of evidence from which an inference of discrimination might be drawn is co-worker Mailey's alleged insensitive remarks that Riley was "too old and too weak" for the ASU and that others were waiting for her to retire.  However, these isolated statements were made over two years before McNeill even became Plaintiff's supervisor.  Further, it is undisputed that Mailey was a non-managerial employee who played no role in the decision to terminate Riley's employment.  Evidence that one co-worker, with no supervisory responsibility, and no involvement in the decisionmaking process, made biased comments two years earlier, lacks meaningful probative value.  *See Fuentes*, 32 F.3d at 767 (3d Cir. 1994) (citing *Ezold*, 983 F.2d at 545).

Significantly, there is evidence to show that McNeill treated similarly situated employees in a similar manner, having also terminated nurses born in 1965, 1966, 1978, and 1985 after issuing written warnings regarding their unsatisfactory job performances.  And although Riley suggests that Mailey may have tainted the decisionmaking process or coerced patients into making complaints about her, she fails to present any evidence that the patients or families were coerced or that McNeill knew or had reason to know that the patient complaints were baseless. In fact, the clear pattern in the evidentiary record of Riley repeatedly engaging in similar unsatisfactory conduct triggering disciplinary measures from a variety of supervisors suggests just the opposite—that patient/family, co-worker, and managerial complaints were voluntary and based on shared experiences interacting with Riley.

In emphasizing Riley's positive performance appraisals in previous years, Plaintiff ignores the fact that Corrective Action Notices were also issued in 2004, 2005, 2010, and 2011. In 2012, there is clearly an undisputed, heavily documented history of patient complaints and managerial warnings regarding her behavior and interaction with co-workers and patients, including patient safety concerns.  The fact that several new incidents occurred under McNeill's watch, including one that was personally witnessed by McNeill, weighs against a conclusion that discriminatory animus must have been the reason for Plaintiff's firing.  McNeill conducted an extensive investigation of the incident that led to Plaintiff's final written warning.  Relying on independent sources, McNeill suspended Plaintiff only after giving her numerous warnings, both verbal and written.  Finally, the plain terms of St. Mary's disciplinary policy are clear that the progressive disciplinary four-step procedure is not mandatory.  Rather, the level of discipline is supposed to be based on a variety of factors, including the severity of the infraction.  In turn, McNeill was well within her authority to expedite Riley's progressive discipline by skipping

28

steps of the disciplinary procedure.  The policy even lists patient safety concerns and harm to St.

Mary's reputation in the community as examples of legitimate causes for termination.  McNeill's

record of imposing discipline in a wide range of situations, and terminating employees both

inside and outside the protected class, is consistent with a medical professional enforcing

standards of good care—not decisionmaking animus.   In that respect, it bears mention that St.

Mary is responsible for maintaining the appropriate standard of care for the patients it treats.

Riley's most fervent opposition to Defendant's Motion is drawn from her own subjective

perception of her job performance.  A cursory review of the lengthy record might suggest that

the sheer volume of alleged factual disputes must mean there is a genuine issue for trial, but an

in-depth analysis reveals that no such issue exists.  While I sympathize with Plaintiff's

frustration and distress over losing her job with St. Mary, controlling case law is clear that

federal courts do not oversee the business decisions of private employers and at-will employees.

Riley challenges St. Mary's various responses to her conduct and often defends or attempts to

justify her own actions.  But, most significantly, she does not challenge the underlying facts of

each disciplinary incident.  Whether St. Mary reacted appropriately to each situation is simply

not for me to assess.  Accordingly, Plaintiff has not raised a genuine issue of material fact that

would allow a reasonable juror to find in her favor, and her claim for discrimination fails at this

stage of the *McDonnell Douglas* framework.

### ii.  Plaintiff's Retaliation Claim

Incorporating the above pretext analysis here, Plaintiff's retaliation claim also fails.

Regardless of whether or not Plaintiff has established a *prima facie* case, she has not raised a

genuine issue of material fact that would allow a reasonable juror to infer that her termination

was motivated by retaliation for protected conduct.  There is simply a dearth of evidence

suggesting that Plaintiff's discharge was motivated by anything other than legitimate business reasons.  Therefore, Defendant is again entitled to judgment as a matter of law.

III.    <u>Conclusion</u>

Based on the foregoing, Defendant's Motion for Summary Judgment is granted in full.


<u>      /s/ Gerald Austin McHugh</u>
United States District Court Judge